# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARC POKEMPNER, | ) | |
| | ) | |
| Plaintiff, | ) | NO. 10-cv-8297 |
| -vs- | ) | |
| | ) | JUDGE DARRAH |
| POLARIS IMAGES CORP. a New York | ) | |
| corporation, and DOE I through DOE V, | ) | MAG. JUDGE KEYS |
| | ) | |
| Defendants. | ) | |

## DEFENDANT POLARIS IMAGES CORPORATION'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant Polaris Images Corporation ("Polaris"), by and through its undersigned counsel, hereby submits this Local Rule 56.1 Statement of Undisputed Material Facts[1], and states as follows:

### Parties

1.      Plaintiff Marc PoKempner is a professional photographer located in Chicago, Illinois.  Complaint, ¶ 2.[2]

2.      Defendant Polaris is a small independent news photography agency that represents photographers and licenses photographs to media and corporate clients worldwide. Pappas Decl., ¶ 2.

---

[1]      For the purposes of this motion only, the statements alleged in Plaintiff's Complaint made herein are taken as true.  Polaris reserves the right to challenge the allegations in the Complaint outside of the context of this motion for summary judgment.

[2]      Plaintiff's December 20, 2010 Complaint is attached to the Declaration of Matthew A. Kaplan ("Kaplan Decl.") as Exhibit A (hereinafter, "Complaint").

{A072300.DOC/1}

**<u>Polaris' Business</u>**

3.      Polaris maintains a database of approximately 1.5 million images from around the world spanning a myriad of topics such as news, politics, business, arts and entertainment, sports, fashion, science and travel.  Pappis Decl., ¶ 4.

4.      Generally, when an image is received from a photographer or another source such a newspaper, government agency, political campaign, another photo agency etc., Polaris ingests it into Polaris' database using a software program.  During the ingestion process, a Polaris Caption Editor will review the information embedded in the metadata of the file, such as a description of the image, keywords to permit searches for the image, the date and place where the image was taken, the author and/or copyright owner, and any special instructions regarding the distribution of an image.  None of the accurate information embedded in the metadata is removed or altered.  However, some of the information may be edited so as to conform with Polaris' captioning standards.  Pappis Decl., ¶ 5.

5.      In addition to the information listed above, Polaris is added to the "Credit" field of the metadata.  As is standard in the industry, the "Credit" field in metadata does not designate or identify the author or photographer of a certain image.  Instead, it designates the agency as the source of the image so the publisher knows who to pay the licensing fees to upon publication. Pappis Decl., ¶ 6.

6.      Polaris receives hundreds if not thousands of images each day to include in its database.  Pappis Decl., ¶ 7.

7.      Polaris' founder and President J.P. Pappis does not review each individual image as it is received by Polaris.  Instead, Polaris' staff members and/or editors are responsible for reviewing images and ingesting them into the database.  Pappis Decl., ¶ 7.

{A072300.DOC/1}

8.      It is standard in the photography licensing industry the political campaign organizations will provide news image agencies, wire agencies and news reporting organizations handouts of photographs that the candidate wants distributed.  Pappis Decl., ¶ 8.

**Barack Obama's Campaign Organization Delivers the Images At Issue to Polaris**

9.      On February 11, 2008, Katie Hogan of Obama for America ("OFA"), Barack Obama's 2008 presidential election campaign organization, delivered to Kelly Price of Polaris by e-mail digital copies of a number of images of Barack Obama taken when President Obama was running for Senate as well as other images of Mr. Obama as a child and of Mr. Obama's family. Pappis Decl., ¶ 9, Ex. 1.

10.     The cover e-mails from Ms. Hogan contained no restrictions on the use of the Images.  Pappis Decl., ¶ 10, Ex. 1.

11.     The  metadata of the digital files Polaris received from OFA contained no information regarding any restrictions on publication nor information about the photographer or copyright holder.  Pappis Decl., ¶ 10, Exs. 2, and 3.

12.     Shortly after receipt of the Handshake Image and Petition Image from OFA by e-mail, a Polaris staff member initiated the procedure to upload the Images into Polaris' database.  As there was no metadata, a Polaris editor added caption, location and other information regarding the Images.  Pappis Decl., ¶ 11, Exs. 4 and 5.

13.     As there was no copyright management information in the original files sent by OFA, Polaris did not and could not remove copyright management information from the original files of the Images.  Pappis Decl., ¶ 12.

14.     At the time when Polaris received the Petition and Handshake Images from OFA, ingested them into Polaris' database and made them available to the public for licensing in or

about February 2008, Polaris had no idea that Mr. PoKempner had not granted OFA distribution rights in the Images. Pappis Decl., ¶ 13.

15.     Given the long standing industry practice and the absence of restrictions placed on the Images when sent, Polaris would not have any reason to believe that OFA did not have distribution rights. Pappis Decl., ¶ 13.

16.     At the end of February 2008, OFA advised ABC, CBS and NBC that it did not have rights to the Images and the Images should be pulled out of distribution.  Kaplan Decl., Ex. B.

17.     OFA never contacted Polaris to advise it that it did not have rights to distribute the Images.  Pappis Decl., ¶ 14.

18.     It was not until approximately June or July 2009 when Polaris first learned that there was an issue with the Images and of Plaintiff Marc PoKempner's claims.  Pappis Decl., ¶ 14.

**Polaris' Contact with Mr. PoKempner**

19.     On or about May 12, 2008, Polaris' President J.P. Pappis saw a photograph of Barack Obama from his early political career taken by Mr. PoKempner on the front page of the *New York Times*. Pappis Decl., ¶ 15.

20.     Mr. Pappis had a colleague at Polaris, Peter Bolioli, contact Mr. PoKempner to ask whether he would like Polaris to represent him and syndicate his images.  Pappis Decl., ¶ 15; Complaint, ¶ 18.

21.     Mr. PoKempner was not interested in entering into a business relationship with Polaris.  Pappis Decl., ¶ 17; Complaint, ¶ 18.

22.     Given the hundreds of thousands of images in Polaris' database, Mr. Pappis did not realize that there were copies of Mr. PoKempner's Images in Polaris' database.  Pappis Decl., ¶ 16.

23.     It was not until Mr. PoKemper initially raised his claims against Polaris that Mr. Pappis discovered that the Images supplied by OFA to Polaris were Mr. PoKempner's.  Pappis Decl., ¶ 18.

24.     Once Mr. Pappis learned of Mr. PoKempner's claim, he immediately withdrew the Images from Polaris' database.  Pappis Decl., ¶ 19.

25.     Mr. Pappis also advised Polaris' partner licensing agents overseas to whom Polaris sent the Images for licensing in their territories that there was an issue with the distribution rights and to delete the Images from their files.  Pappis Decl., ¶ 19.

26.     During the period of time Polaris offered the Images for licensing, Polaris grossed approximately $4,000 for approximately 17 licensed uses.  Pappis Decl., ¶ 20, Ex. 6.

27.     The majority of those licenses were made through Polaris' foreign agents and with foreign publishers or licensees for foreign publications.  Pappis Decl., ¶ 20, Ex. 6.

**Plaintiff's Copyright Registration**

28.     Plaintiff filed an application for a Group Registration of Published Photographs with the United States Copyright Office on September 4, 2009, titled "Barack Obama Photographs Published in 2008."  That application matured into Registration No. VA 1-420-045.  Complaint, ¶ 26, Ex. G; Kaplan Decl., Ex. C.

29.     Among the images Plaintiff sought to register were the Handshake Image and the Petition Image. *See* Complaint, ¶ 26; Kaplan Decl., Ex.C (Petition Image MPK.0141 and Handshake Image MPK.143).

{A072300.DOC/1}

30. On the application, Plaintiff claimed that the Petition Image was first published on November 4, 2008 in Multi-Media International's book *Obama, the Forty-Fourth President*. Complaint, Ex. G; Kaplan Decl., Ex. C (MPK.132)

31. Plaintiff asserted that the *Obama, the Forty-Fourth President* book contained an unauthorized copy of the Petition Image provided by Defendant Associated Press. Complaint, ¶¶ 17, 65, Ex. E.

32. Also on the application, Plaintiff claimed that the Handshake Image was first published on February 25, 2008 on ABC's *Nightline* – "The Making of Obama" segment. Complaint, Ex. G; Kaplan Decl., Ex. C (MPK.132)

33. Plaintiff asserted that the segment on ABC's *Nightline* contained an unauthorized copy of the Handshake Image. Complaint, ¶ 17.

**Plaintiff's Communications with OFA and ABC's *Nightline* Staff**

34. In or around February 2008, Plaintiff became aware that the Handshake Image was being exploited without his authorization on ABC's *Nightline* program. Complaint, ¶ 17.

35. On March 1, 2008, Plaintiff e-mailed Katie Hogan of OFA to confront her regarding where she got the image from. Kaplan Decl., Ex. D.

36. On March 1, 2008, Katie Hogan responded by e-mail to Plaintiff stating: "I sincerely apologize that your photo was distributed. We have a library of photos of Barack from before the campaign and it seems your photo got thrown in the mix. We were under the impression that it was a photo we owned. I have removed it from our library and have contacted a [sic] ABC, NBC and CBS to make them aware that we do not own the rights." Kaplan Decl., Ex. B.

37.     OFA had distributed the Images by e-mail to other news organizations. Kaplan

Decl., Ex. B.

38.     After Plaintiff confronted ABC about the unauthorized use of the Handshake

Image, Dan Green of ABC told Plaintiff in an e-mail dated March 6, 2008: "Let me reassure you

there was no intention to conceal our use of this photo.  It was merely a misunderstanding

between the producer and the Obama campaign over the rights to the picture."  owned it."

Kaplan Decl, Ex. E.

39.     Further, Myrna Michel of ABC responded in an e-mail on March 6, 2008:  "We

have been informed by the Barack Campaign that they did not have the rights to distribute your

photograph of Barack Obama shaking hands with supporters used in the ABC News Nightline

segment on 2/25/08.  We were unaware that they did not own the rights as we were told it was

handout to us and that they Kaplan Decl., Ex. F.

40.     In response, Plaintiff apologized that ABC "was misinformed by the campaign."

Kaplan Decl., Ex. G.

                              Respectfully submitted,


DATED:        New York, New York
              March 1, 2012


                              COWAN, DEBAETS, ABRAHAMS
                                 & SHEPPARD LLP


                              _____/s/ Matthew A. Kaplan_____
                              Nancy E. Wolff (admitted *pro hac vice*)
                              Matthew A. Kaplan (admitted *pro hac vice*)
                              41 Madison Avenue, 34th Floor
                              New York, New York 10010
                              (212) 974-7474


{A072300.DOC/1}

DAVIS MCGRATH LLC

William T. McGrath, Esq.
125 South Wacker Drive, Suite 1700
Chicago, IL 60606
(312) 332-3033

*Attorneys for Defendant Polaris Image Corporation*